NATIONAL TEA CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23189.   Promulgated November 5, 1929.

*Arthur Rothstein, Esq.*, for the petitioner.
*B. M. Coon, Esq.*, and *T. M. Marshall, Esq.*, for the respondent.

1224

1226

OPINION.

ARUNDELL: The facts found herein are, with some rearrangement, the facts stipulated by the parties. While we deem some of them immaterial to a disposition of the issues, we have set them out because they were stipulated.

The first issue is whether the allotment agreements under which stock was issued to officers and employees in 1920 and 1921 may be included in invested capital for the year 1921. No deficiency having been found for 1920, we have no jurisdiction to determine the tax

for that year, but we may properly consider facts pertaining to that year which will affect the tax for 1921. Section 274(g), Revenue Act of 1926. We have heretofore decided that contracts of sale similar to the ones we have here, where the stock was actually issued, may be included in invested capital at their actual value at the time they are paid in for stock, upon the ground that they are "evidences of indebtedness" within the meaning of section 325 of the Revenue Act of 1921. See *Haskell & Barker Car Co.*, 9 B. T. A. 1087; *Fidelity Trust Co.*, 13 B. T. A. 109; *Metropolitan Tobacco Co.*, 16 B. T. A. 525. The next question then is that of the value of the agreements. The value at which evidences of indebtedness may be included in invested capital is "actual cash value" (section 326, Revenue Act of 1921) and that value must be inherent in the instruments without reference to the value of the stock deposited as collateral. *Columbus Canning Co.*, 10 B. T. A. 1085; *Doernbecher Manufacturing Co.*, 11 B. T. A. 248. On this point there is a lack of evidence which must be fatal to petitioner's claim. There is nothing shown as to the financial responsibility or solvency of the allottees of the stock. We presume that that part of the stipulation showing the annual salaries of the officers and employees was directed to this point. If so, it is insufficient. Merely stating one's annual income is no proof of his solvency or of the value of his obligations. Even if we assume the solvency of each of the debtors, it does not necessarily follow that their obligations had an actual cash value equal to their face value. On the bare figures given it is hardly likely that the contracts could have been sold for cash at their face amounts. For example, Dempster, whose salary was $3,238.75 and Kamp, whose salary was $4,480, each contracted for 100 shares of stock at a total cost to each of $9,750. This amount on the five-year payment plan required an annual outlay of $1,950, exclusive of interest on the unpaid balance. It may be that these purchasers had other means, but there was no showing made that such was the case. It may also be that the contracts had an actual cash value somewhat less than their face values, but, if so, we are unable to compute it on the state of the record. We, therefore, approve the respondent's determination in excluding the contracts from invested capital. *Metropolitan Tobacco Co., supra.*

The next issue, which is raised by affirmative allegations of the respondent, is whether invested capital should be reduced because of the purchases by petitioner of its own stock, both common and preferred, in 1921. The respondent, according to the stipulation, reduced invested capital on account of only one stock purchase— that of January 3, 1921. The subsequent stock purchases made by petitioner, according to the stipulation, "were assumed to have been taken care of out of available earnings * * * as shown in the

notice of deficiency." The notice of deficiency was neither attached to any of the pleadings nor put in evidence, and so we do not know what it shows.

Purchases by a corporation of its own stock serve to reduce invested capital at least by the amount paid in for such stock, regardless of the amount of current earnings available. *Fairmont & Cleveland Coal Co.*, 12 B. T. A. 1296; *Clearfield Lumber Co.*, 3 B. T. A. 1282. It is therefore clear that the respondent erred in attributing the entire amount of purchases to current earnings and that the amount paid in by the stockholders, at least, should have come out of invested capital. The question then is, what was the amount paid in? The burden of proof on this question is on the respondent and he has failed to meet it. In his brief he makes several suggestions as to how we may arrive at the amount by which invested capital should be reduced. One is that we should take the par value of the original stock. It seems to us quite evident that this is not a proper basis because of the subsequent reorganization and consolidation whereby the par value stock of three companies was called in and no-par stock of the petitioner issued. Another suggestion advanced is that we use the figure of $77.16 per share, this amount being the appraised value of assets exchanged for the common stock in the 1919 reorganization. The appraised value as shown in the minutes of the directors' meeting would form a proper basis only if it represented the actual cash value at which the assets were included in invested capital. Whether these two values were the same is not shown. Attention is also called to the fact that Matthiessen reported a gain on his sale of stock to the petitioner of the difference between $75 and $97.50 per share. It is not shown, however, what the $75 represents and we can not say that it was the amount paid in to the petitioner.

The result of our consideration of the case is to leave the parties where we found them.

> *Decision will be entered affirming the deficiency determined by the respondent.*